DANIEL V. KOHLS (State Bar No. 167987)
DANIEL W. ROBERTSON (State Bar No. 282532)
HANSEN, KOHLS, SOMMER & JACOB, LLP
1520 EUREKA ROAD, SUITE 100
ROSEVILLE, CALIFORNIA 95661
TELEPHONE: (916) 781-2550
FACSIMILE:   (916) 781-5339
dkohls@hansenkohls.com
drobertson@hansenkohls.com

Attorneys for Plaintiff
RONALD DILBECK, individually
and on behalf of THE ESTATE OF WALTER T. DILBECK

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD DILBECK, individually and on behalf of THE ESTATE OF WALTER T. DILBECK, | Case No. |
| Plaintiff, | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| vs. | |
| PRINSTON PHARMACEUTICAL INC. d/b/a SOLCO HEALTHCARE U.S., LLC; | |
| and SOLCO HEALTHCARE U.S., LLC; | |
| and ZHEJIANG HUAHAI PHARMACEUTICAL CO., LTD.; | |
| and  HUAHAI US INC.; | |
| and TEVA PHARMACEUTICAL INDUSTRIES, LTD.; | |
| and  TEVA PHARMACEUTICALS USA, INC., a Delaware corporation; | |
| and EDNA DILBECK; | |
| and CORDELIA MORRIS, | |
| Defendants. | |
| _____/ | |

This is a wrongful death action on behalf of Plaintiff Ronald Dilbeck, individually and as the Successor-in-Interest to THE ESTATE OF WALTER T. DILBECK ("Plaintiffs"), against Nominal Defendant Edna Dilbeck ("Edna"), as the surviving sister of decedent, Nominal Defendant Cordelia aka "Corky" Morris ("Cordelia"), as the surviving sister of decedent, Defendants Prinston Pharmaceutical Inc. d/b/a Solco Healthcare LLC and Solco Healthcare U.S., LLC (together "Solco"), and Zhejiang Huahai Pharmaceutical Co., Ltd., ("ZHP") and Huahai US Inc. ("Huahai"), and Teva Pharmaceutical Industries, Ltd. ("Teva Pharmaceutical") and Teva Pharmaceuticals USA, Inc. ("Teva USA") (together "Teva").  Upon the investigation of counsel and, where so alleged, upon information and belief, Plaintiffs allege as follows:

## I.

## NATURE OF THE CASE

1.      On June 26, 2018, 70 year old Walter T. Dilbeck ("Decedent") passed away from malignant neoplasm of the liver while taking the drug Valsartan as prescribed for high blood pressure that was prescribed to Decedent on or about May 23, 2017.  Decedent is survived by his brother Ronald Dilbeck and sisters Edna Dilbeck and Cordelia Morris.

2.      Plaintiff brings this wrongful death action on behalf of himself and his brother's estate regarding the respective manufacturing, distribution, and sale of Valsartan generic prescription medications adulterated with N-nitrosodimethylamine, a carcinogenic substance by all Defendants (except for the nominally named defendants) (collectively, "Defendants").

3.      Valsartan is a prescription medication mainly used for the treatment of high blood pressure and congestive heart failure.

4.      At all times during the period alleged herein, Defendants represented and warranted to consumers that their Valsartan products were therapeutically equivalent to and otherwise the same as the brand Diovan®, were otherwise fit for their ordinary uses, and were otherwise manufactured and distributed in accordance with applicable laws and regulations.

5.      Generic drugs such as Valsartan are marketed and sold to consumers such as Walter T. Dilbeck when the brand-name version of the drug comes off patent, and other competitors are

///

able to seek approval for, market, and sell bioequivalent versions of the brand-name drug. These generic equivalents, such as Valsartan, are supposed to be of equal quality and equal safety.

6. Due to manufacturing defects originating in Zhejiang's facility in China, certain generic formulations of Valsartan have become adulterated with an organic chemical known as N-nitrosodimethylamine ("NDMA").

7. However, for years, Defendants willfully ignored warnings signs regarding the operating standards at the Zhejiang Huahai Pharmaceuticals ("ZHP") manufacturing plant in China, and continued to allow ZHP to manufacture their Valsartan products for sale to consumers in the United States even after Defendants knew or should have known that their Valsartan products manufactured by ZHP contained or likely contained NDMA and/or other impurities.

8. These adulterated Valsartan drugs were introduced into the American market at least as far back as 2015 by Defendants who profited from their sale to American consumers, such as Decedent. However, evidence now suggests that the contamination dates back at least as far as 2012. Decedent paid for all or part of his Valsartan prescriptions that were illegally introduced into the market by Defendants and which were not fit for their ordinary use. Defendants have been unjustly enriched through the sale of and profit from these adulterated drugs since at least 2012. Defendants' conduct also constitutes actionable common law fraud, consumer fraud, and other violations of state law.

9. On July 13, 2018, the U.S. Food & Drug Administration ("FDA") announced a voluntary recall of several brands of Valsartan-containing generic medications, including those manufactured and distributed by Huahai, among others. The recall was due to the presence of NDMA in the recalled products.

10. Decedent was injured by the full purchase price of his Valsartan-containing medications and incidental medical expenses. These medications are worthless, as they are contaminated with carcinogenic and harmful NDMA and are not fit for human consumption.

///

///

///

## II.

## JURISDICTION AND VENUE

11.     This wrongful death action is brought for the redress of alleged deprivations of constitutional rights as protected by 21 U.S.C. §§ 351 and 355.  In addition, this Court has original jurisdiction pursuant to 28 U.S.C. § 1331.

12.     This Court has personal jurisdiction over Defendants because Defendants have sufficient minimum contacts in California, and otherwise intentionally avail themselves of the markets within California through their business activities, such that the exercise of jurisdiction by this Court is proper and necessary.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, a substantial part of the property that is the subject of this action is situated in this District, and the Defendants are subject to personal jurisdiction in this District.

## III

## INTRADISTRICT ASSIGNMENT

14.     A substantial part of the events or omissions which give rise to this claim occurred in Alameda County, California, and therefore pursuant to Local Rules 3-2( c) and (d) should be assigned to the Oakland Division.

## IV.

## PARTIES

15.     Plaintiff Ronald Dilbeck, individually and on behalf of THE ESTATE OF WALTER T. DILBECK, deceased, is the brother of Walter T. Dilbeck.  THE ESTATE OF WALTER T. DILBECK is represented by and through its Successor-in-Interest Ronald Dilbeck pursuant to Code of Civil Procedure § 377.30.  Ronald Dilbeck, at all times herein relevant, is a resident of Placer County, California, and is a surviving brother of the Walter T. Dilbeck.

16.     Decedent Walter T. Dilbeck was a California resident.  Decedent paid money for one or more of Defendants' Valsartan products.  Defendants expressly and impliedly warranted to Decedent that their respective generic Valsartan products were the same as brand Diovan.  Had

Defendants' deception about the impurities within their products been made known earlier, Decedent would not have paid for Defendants' Valsartan products.

17.     Nominal Defendant Edna Dilbeck, is the surviving sister of decedent.  She has disclaimed any interest in this lawsuit.

18.     Nominal Defendant Cordelia Morris, is the surviving sister of decedent. She has disclaimed any interest in this lawsuit.

19.     Defendant Prinston Pharmaceutical Inc. d/b/a Solco Healthcare LLC ("Prinston") is a Delaware limited liability company with its principal place of business located at 2002 Eastpark Blvd., Cranbury, New Jersey 08512.  Defendant Prinston is a subsidiary of Huahai Pharmaceutical. At all times material to this case, Prinston has been engaged in the manufacturing, sale, and distribution of adulterated generic Valsartan in the United States, including in the State of California.

20.     Defendant Zhejiang Huahai Pharmaceutical Co., Ltd. ("ZHP") is a corporation organized and existing under the laws of the People's Republic of China, and it maintains its principal place of business at Xunqiao, Linhai, Zhejiang 317024, China.  Zhejiang is deemed to be a citizen of the People's Republic of China. At all times material to this case, ZHP has been engaged in the manufacturing, sale, and distribution of adulterated generic Valsartan in the United States, including in the State of California.

21.     Defendant Solco Healthcare U.S., LLC ("Solco") is a Delaware limited liability company with its principal place of business located at 2002 Eastpark Blvd., Cranbury, New Jersey 08512.  Defendant Solco is a subsidiary of Huahai Pharmaceutical.  At all times material to this case, Solco has been engaged in the manufacturing, sale, and distribution of adulterated generic Valsartan in the United States, including in the State of California.

22.     Defendant Huahai US Inc. ("Huahai") is a New Jersey corporation, with its principal place of business located at 2002 Eastpark Blvd., Cranbury, New Jersey 08512. Defendant Huahai US is a subsidiary of Huahai Pharmaceutical.  At all times material to this case, Huahai has been engaged in the manufacture, sale, and distribution of adulterated generic Valsartan in the United States, including in the State of California.

23.     Defendant Teva Pharmaceutical Industries Ltd. ("Teva Pharmaceutical") is a foreign company incorporated and headquartered in Peta Tikvah, Israel.  Teva on its own and/or through its subsidiaries regularly conducts business throughout the United States of America and its territories and possessions.  At all times material to this case, Teva has been engaged in the manufacturing, sale, and distribution of adulterated generic Valsartan in the United States including in California.

24.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation, with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania 19454, and is a wholly owned subsidiary of Teva Pharmaceutical.  Teva USA on its own and/or through its subsidiaries regularly conducts business throughout the United States of America and its territories and possessions.  At all times material to this case, Teva USA has been engaged in the manufacturing, sale, and distribution of adulterated generic Valsartan in the United States including in California.  Collectively, Teva Pharmaceutical and Teva USA are referred to as "Teva" herein.

25.     On information and belief, Huahai conducts substantial business in the State of New Jersey and manufactures, markets and/or distributes Valsartan for use in generic drugs, including the prescription drug, Valsartan, which is the subject of this litigation, by incorporating Valsartan manufactured in China by Defendant Zhejiang Huahai Pharmaceutical ("ZHP").  According to Huahai's website, it is a wholly-owned subsidiary of Zhejiang focusing on the sales and marketing of APIs and Intermediates.  Huahai lists Valsartan as one of its products.

26.     On information and belief, ZHP is a corporation organized and existing under the laws of the People's Republic of China, and it maintains its principal place of business at Xunqiao, Linhai, Zhejiang 317024, China.  Zhejiang is deemed to be a citizen of the People's Republic of China.

27.     ZHP touts on its website that: (a) it is a large scaled modern pharmaceutical group that integrates formulations, APIs (active pharmaceutical ingredients) and intermediates; (b) it has 11 subsidiary entities in the United States, Shanghai, Hangzhou, and Linhai; (c) it occupies an area of 800,000 square meters, and has a staff of 3,400; (d) its formulation workshops are designed in

strict compliance with the international cGMP standard (defined below); (e) it is the first pharmaceutical company in China that has passed United States FDA approval; (f) it ensures that production is operated in accordance with good manufacturing practices and that its product quality meets the required specifications; and (g) it is equipped with state-of-the-art devices ensuring high quality raw materials, final products and in process intermediates.

# V.

# FACTUAL ALLEGATIONS

## A.    VALSARTAN BACKGROUND

28.    Valsartan is a generic prescription drug mainly used to treat hypertension, high blood pressure, congestive heart failure and to prevent heart attacks and strokes.  It was originally marketed and sold under the brand name, DIOVAN® ("Diovan").

29.    Diovan's FDA-approved label specifies its active and inactive ingredients.  NDMA is not an FDA-approved ingredient of Diovan.  Nor is NDMA an FDA-approved ingredient of any generic Valsartan product.

30.    Due to manufacturing defects originating from overseas laboratories in China, certain generic formulations have become contaminated with NDMA.

31.    At all times during the period alleged herein, Defendants each represented and warranted to consumers that their generic Valsartan products were therapeutically equivalent to and otherwise the same as Diovan, were otherwise fit for their ordinary uses, and were otherwise manufactured and distributed in accordance with applicable laws and regulations.

## B.    NDMA BACKGROUND

32.    Plaintiff seeks to pursue a wrongful death action against the Defendants for supplying, manufacturing, distributing, and ultimately selling Valsartan that was adulterated and defective because it contained NDMA, which rendered the Valsartan adulterated, unsafe, and dangerous for consumption by humans ("the Adulterated Valsartan"), to Decedent.

33.    On information and belief, NDMA is not currently produced in pure form or commercially used in the United States, except for research purposes.  On information and belief, NDMA was formerly used in the production of, among other things, liquid rocket fuel.

34.     The United States EPA classifies NDMA as a B2 (probable human) carcinogen, based on the induction of tumors in both rodents and non-rodent mammals exposed to NDMA by various routes.

35.     According to the EPA, in animal studies of various species including rats and mice, exposure to NDMA has caused tumors primarily of the liver, respiratory tract, kidney and blood vessels.

36.     NDMA is listed as a "priority toxic pollutant" in federal regulations.  See 40 CFR § 131.36.

37.     The U.S. Department of Health and Human Services states that NDMA is reasonably anticipated to be a human carcinogen (DHHS 2011).

38.     The American Conference of Governmental Industrial Hygienists has classified NDMA as a Group A3 confirmed animal carcinogen with unknown relevance to humans (ACGIH 2012).

**C.     THE GENERIC DRUG APPROVAL FRAMEWORK**

39.     The Drug Price Competition and Patent Term Restoration Act of 1984   - more commonly referred to as the Hatch-Waxman Act - is codified at 21 U.S.C. § 355(j).

40.     Brand drug companies submitting a New Drug Application ("NDA") are required to demonstrate clinical safety and efficacy through well-designed clinical trials. 21 U.S.C. § 355, et seq.

41.     By contrast, generic drug companies submit an Abbreviated New Drug Application ("ANDA").  Instead of demonstrating clinical safety and efficacy, generic drug companies need only demonstrate bioequivalence to the brand or reference listed drug ("RLD").  Bioequivalence is the "absence of significant difference" in the pharmacokinetic profiles of two pharmaceutical products.  21 C.F.R. § 320.1(e).

42.     The bioequivalence basis for ANDA approval is premised on the generally accepted proposition that equivalence of pharmacokinetic profiles of two drug products are accepted as evidence of therapeutic equivalence.  In other words, if (1) the RLD is proven to be safe and effective for the approved indication through well-designed clinical studies accepted by the FDA,

and (2) the generic company has shown that its ANDA product is bioequivalent to the RLD, then (3) the generic ANDA product must be safe and effective for the same approved indication as the RLD.

43.     Generic drug manufacturers have an ongoing federal duty of sameness in their products.  Under 21 U.S.C. § 355(j), the generic manufacturer must show the following things as relevant to this case: the active ingredient(s) are the same as the RLD, § 355(j)(2)(A)(ii); and, that the generic drug is "bioequivalent" to the RLD and "can be expected to have the same therapeutic effect," id. at (A)(iv).  A generic manufacturer (like a brand manufacturer) must also make "a full statement of the composition of such drug" to the FDA. Id. at (A)(vi); see also § 355(b)(1)(C).

44.     A generic manufacturer must also submit information to show that the "labeling proposed for the new drug is the same as the labeling approved for the [RLD][.]" 21 U.S.C. § 355(j)(2)(A)(v).

45.     Upon granting final approval for a generic drug, the FDA will typically state the generic drug is "therapeutically equivalent" to the branded drug.  The FDA codes generic drugs as "A/B rated" to the RLD branded drug.  Pharmacists, physicians, and patients can fully expect such generic drugs to be therapeutically interchangeable with the RLD, and generic manufacturers expressly warrant as much through the inclusion of the same labeling as the RLD delivered to consumers in each and every prescription of their generic products.

**D.     BACKGROUND ON CURRENT GOOD MANUFACTURING PRACTICES ("cGMPs")**

46.     Under federal law, pharmaceutical drugs must be manufactured in accordance with "current Good Manufacturing Practices" ("cGMP(s)") to assure they meet safety, quality, purity, identity, and strength standards.  See 21 U.S.C. § 351(a)(2)(B).

47.     The FDA's cGMP regulations are found in 21 C.F.R. Parts 210 and 211.  These detailed regulations set forth minimum standards regarding: organization and personnel (Subpart B); buildings and facilities (Subpart C); equipment (Subpart D); control of components and drug product containers and closures (Subpart E); production and process controls (Subpart F); packaging and label controls (Subpart G); holding and distribution (Subpart H); laboratory controls

(Subpart I); records and reports (Subpart J); and returned and salvaged drug products (Subpart K).

The FDA has worldwide jurisdiction to enforce these regulations if a facility is making drugs

intended to be distributed in the United States.

48.     Any drug not manufactured in accordance with cGMPs is deemed "adulterated" and

may not be distributed or sold in the United States.  See 21 U.S.C. §§ 331(a), 351(a)(2)(B).

49.     Drugs are deemed to be adulterated if the manufacturer fails to comply with cGMPs

to assure the drug's safety, quality, purity, identity, and strength and/or if they are contaminated.

See 21 U.S.C. § 351(a)(2)(A), (B).  Federal law prohibits a manufacturer from directly or indirectly

causing adulterated drugs to be introduced or delivered for introduction into interstate commerce.

See id. § 331(a).  States have enacted laws adopting or mirroring these federal standards.

50.     Per federal law, cGMPs include "the implementation of oversight and controls over

the manufacture of drugs to ensure quality, including managing the risk of and establishing the

safety of raw materials, materials used in the manufacturing of drugs, and finished drug products."

21 U.S.C. § 351(j).  Accordingly, it is a cGMP violation for a manufacturer to contract out

prescription drug manufacturing without sufficiently ensuring continuing quality of the

subcontractor's operations.

51.     Indeed, FDA regulations require a "quality control unit" to independently test drug

products manufactured by another company on contract:

> a.  There shall be a quality control unit that shall have the responsibility and
> authority to approve or reject all components, drug product containers, closures,
> in-process materials, packaging material, labeling, and drug products, and the
> authority to review production records to assure that no errors have occurred or, if
> errars (sic) have occurred, that they have been fully investigated.  The quality
> control unit shall be responsible for approving or rejecting drug products
> manufactured, processed, packed, or held under contract by another company.

21 C.F.R. § 211.22(a).

## E.     THE ZHEJIANG HUAHAI PHARMACEUTICAL ("ZHP") MANUFACTURING FACILITIES

52.     Zhejiang Huahai Pharmaceutical ("ZHP") is a subsidiary of Huahai

Pharmaceutical., which is also the corporate parent of Defendants Prinston, Huahai US, and Solco.

ZHP has Active Pharmaceutical Ingredient ("API") manufacturing facilities is located in Linhai

City, Zhejiang Province, China.  According to ZHP's website, ZHP was one of the first Chinese companies approved to sell generic drugs in the United States, and it remains one of China's largest exporters of pharmaceuticals to the United States and European Union.

53.     ZHP serves as a contract manufacturer of Defendants' Valsartan products (including Defendant Teva's Valsartan products), and Defendants thus have a quality assurance obligation with respect to ZHP's processes and finished products as set forth above pursuant to federal law.

54.     ZHP has a history of deviations from FDA's cGMP standards that began almost as soon as ZHP was approved to export pharmaceuticals to the United States.

55.     On or about March 27-30, 2007, the FDA inspected ZHP's Linhai City facilities. That inspection revealed "deviations from current good manufacturing processes (cGMP)" at the facility.  Those deviations supposedly were later corrected by ZHP.  The results of the inspection and the steps purportedly taken subsequent to it were not made fully available to the public.

56.     On May 15-19, 2017, the FDA again inspected ZHP's Linhai City facilities.  That inspection resulted in the FDA's finding that ZHP repeatedly re-tested out-of-specification ("OOS") samples until obtaining a desirable result.  This practice allegedly dated back to at least September 2016, per the FDA's letter at the time.

57.     This May 2017 inspection also resulted in the FDA's finding that "impurities occurring during analytical testing are not consistently documented/quantitated[.]"  These findings were not made fully available to the public.

58.     Further, for OOS sampling results, ZHP routinely invalidated these results without conducting any kind of scientific investigation into the reasons behind the OOS sample result.  In fact, in one documented instance, the OOS result was attributed to "pollution" in the environment surrounding the facility.  ZHP's actions are consistent with systematic data manipulation designed to intentionally conceal and recklessly disregard the presence of harmful impurities such as NDMA.

59.     The May 2017 inspection also found that ZHP's "facilities and equipment [were] not maintained to ensure [the] quality of drug product" manufactured at the facility.  These issues included the FDA's finding that: equipment that was rusting and rust was being deposited into drug

product; equipment was shedding cracking paint into drug product; there was an accumulation of white particulate matter; and black metallic particles were found in API batches.

## F.  DEFENDANTS WERE AWARE OF POTENTIAL NDMA CONTAMINATION AS EARLY AS 2012

60.     Upon information and belief, ZHP changed its Valsartan manufacturing processes in or about 2012, if not earlier.

61.     According to the European Medicines Agency ("EMA") - which has similar jurisdiction to that of the FDA - "NDMA was an unexpected impurity believed to have formed as a side product after Zhejiang Huahai introduced changes to its manufacturing process in 2012." [1]

62.     NDMA is yellow, oily liquid with a faint, characteristic odor and a sweet taste, and is often produced as a by-product of industrial manufacturing processes.

63.     The World Health Organization's ("WHO") International Agency for Research on Cancer ("IARC") classifies NDMA as one of sixty-six (66) agents that are "probably carcinogenic to humans" (Classification 2A).

64.     The U.S. Environmental Protection Agency has likewise classified NDMA as a probable human carcinogen by giving it a "B2" rating, meaning that it is "probably carcinogenic to humans" with little or no human data.

65.     Anecdotally, NDMA has also been used in intentional poisonings.[2]

66.     Most assuredly, NDMA is not an FDA-approved ingredient for branded Diovan or generic Valsartan.  None of Defendants' Valsartan products (or any Valsartan product, for that matter) identifies NDMA as an ingredient on the products' labels or elsewhere.

67.     If Defendants had not routinely disregarded the FDA's cGMPs and deliberately

---

[1]  See European Medicines Agency, UPDATE ON REVIEW OF RECALLED VALSARTAN MEDICINES, at
https://www.ema.europa.eu/en/news/update-review-recalled-valsartan-medicines-preliminary-assessment-possible-risk-patients (last accessed May 15, 2019).

[2]  See Quartz, A COMMON BLOOD-PRESSURE MEDICINE IS BEING RECALLED BECAUSE OF A TOXIC INGREDIENT,
https://qz.com/1330936/the-fda-is-recalling-a-common-blood-pressure-drug-because-it-was-mixed-with-ndma/ (last accessed May 15, 2019).

1   manipulated and disregarded sampling data suggestive of impurities, or had fulfilled their

2   quality assurance obligations, Defendants would have found the NDMA contamination

3   almost immediately.

4       68.   21 C.F.R. § 21 L 110 contains the cGMPs regarding the "Sampling and testing of in

5   process materials and drug products[.]"  Subsection (c) states the following:

6       In-process materials shall be tested for identity, strength, quality, and purity as
        appropriate, and approved or rejected by the quality control unit, during the
7       production process, e.g., at commencement or completion of significant phases or
        after storage for long periods.

8

9   21 GF.R. § 211.110(c)

10      69.   And as reproduced above, Defendants' own quality control units are and were

11  responsible for approving or rejecting drug products manufactured, processed, packed, or held

12  under contract by ZHP.

13      70.   If these sampling-related and quality-control-related cGMPs were properly observed

14  by Defendants and ZHP, the NDMA contamination in Defendants' Valsartan products would have

15  been discovered in 2012.  Defendants were thus on (at minimum) constructive notice that their

16  Valsartan products were adulterated as early as 2012.

17      71.   However, there are indications that Defendants and ZHP had actual knowledge of

18  Valsartan's contamination with NDMA, and made efforts to conceal or destroy the evidence.

19      72.   As alleged above, FDA investigators visited ZHP's facilities in May 2017. In the

20  words of FDA inspectors, ZHP "invalidat[ed] [OOS] results [without] scientific justification" and

21  did not implement "appropriate controls ... to ensure the integrity of analytical testing" and

22  routinely disregarded sampling anomalies suggestive of impurities.

23      73.   These discoveries by the FDA's investigators suggest that ZHP and Defendants

24  were specifically aware of impurities in the drugs being manufactured by ZHP, including

25  specifically contamination of Defendants' Valsartan with NDMA.  The efforts to manipulate data

26  constituted an explicit, effort to conceal and destroy evidence and to willfully and recklessly

27  introduce adulterated Valsartan into the U.S. market.

28  ///

74.     Defendants were also specifically aware of the manufacturing issues at ZHP based on Defendants' awareness of cGMP violations as early as 2012 based on their own monitoring of ZHP and of the Valsartan products being manufactured at ZHP, and based on the FDA's inspections of ZHP's facilities in March 2007 and May 2017.

75.     Indeed, Defendant Solco and ZHP (as well as Huahai US) are owned by the same corporate parent, Huahai Pharmaceutical, and Solco was specifically aware, or should be imputed with actual knowledge, of ZHP's willful deviations from cGMPs.  Solco and Huahai US have offices in the same office building in Cranbury, New Jersey.

76.     And yet, Defendants knowingly, recklessly, and/or negligently introduced adulterated Valsartan into the U.S. market that was contaminated with NDMA.  Defendants failed to recall their generic Valsartan products because they feared permanently ceding market share to competitors.  And, upon information and belief, Defendants issued the "voluntary" recall of their Valsartan products only after the FDA had threatened an involuntary recall.

**G.      FDA ANNOUNCES VOLUNTARY RECALL OF DEFENDANT'S ADULTERATED VALSARTAN**

77.     The FDA is an agency within the U.S. Department of Health and Human Services.

78.     The FDA protects the public health by assuring the safety, effectiveness, and security of human and veterinary drugs, vaccines and other biological products for human use.

79.     On or about July 13, 2018, the FDA announced a voluntary recall of several brands of drugs containing the Adulterated Valsartan, including those supplied, manufactured, distributed and/or sold by Defendants[3] ("the Recall").  The Recall is for products distributed as early as October 2015.  However, as alleged above, it is likely that Defendants' Valsartan manufactured in 2012 and beyond was also contaminated with NDMA.

80.     The Adulterated Valsartan is composed of certain specific lots ("the Lots").  The FDA has issued a list of the Lots that are subject to the Recall.

---

[3]   FDA News Release, FDA ANNOUNCES VOLUNTARY RECALL OF SEVERAL MEDICINES CONTAINING VALSARTAN FOLLOWING DETECTION OF IMPURITY, at https://www.fda.gov/news-events/press-announcements/fda-announces-voluntary-recall-several-medicines-containing-valsartan-following-detection-impurity (last accessed May 15, 2019).

81.     Defendants supplied, manufactured, marketed, distributed and/or sold, respectively, the Lots of Adulterated Valsartan that are subject to the Recall.

82.     Decedent purchased and ingested Adulterated Valsartan from the Lots subject to the Recall that were supplied, manufactured, distributed and/or sold by the Defendants.

83.     According to the Recall, the Lots of the Adulterated Valsartan identified on the Recall List contained NDMA.

84.     ZHP manufactured and/or supplied the Valsartan, and/or the Valsartan active pharmaceutical ingredient used in the manufacture of the Adulterated Valsartan that is subject to the Recall.

85.     In addition to the Recall in the United States, prescription drugs containing Adulterated Valsartan have been recalled in approximately 21 other countries.

86.     According to the FDA, numerous Adulterated Valsartan-containing prescription medications are subject to the Recall, including those identified on Exhibit A hereto.

87.     Decedent consumed Adulterated Valsartan (40 mg tablets) pursuant to his prescription on a daily basis prior to the Recall.

88.     The Adulterated Valsartan purchased and consumed by Decedent was included in the Lots subject to the Recall.

89.     Decedent stopped consuming the Adulterated Valsartan on or about June 11, 2018, by the advice of his doctor after a liver biopsy was performed due to his admittance for abdominal pain.

90.     According to the FDA, on or about July 17, 2018:

> The companies listed below are recalling all lots of non-expired products that contain the ingredient valsartan supplied to them by Zhejiang Huahai Pharmaceuticals, Linhai, China. Not all valsartan-containing medicines distributed in the United States have valsartan active pharmaceutical ingredient (API) supplied by this specific company.  Zhejiang Huahai has stopped distributing its valsartan API and the FDA is working with the affected companies to reduce or eliminate the valsartan API impurity from future products.

///

///

///

-15-
198948
COMPLAINT

**Recalled Products**

| Medicine | Company |
|---|---|
| Valsartan | Major Pharmaceuticals |
| Valsartan | Solco Healthcare |
| Valsartan | Teva Pharmaceuticals Industries Ltd. |
| Valsartan/Hydrochlorothiazide | Solco Healthcare |
| Valsartan/Hydrochlorothiazide | Teva Pharmaceuticals Industries Ltd. |

91.     On or about July 17, 2018, the FDA issued a press release.  According to that press release:

> The U.S. Food and Drug Administration is alerting health care professionals and patients of a voluntary recall of several drug products containing the active ingredient valsartan, used to treat high blood pressure and heart failure. ***This recall is due to an impurity, N-nitrosodimethylamine (NDMA), which was found in the recalled products.***  However, not all products containing valsartan are being recalled. ***NDMA is classified as a probable human carcinogen (a substance that could cause cancer) based on results from laboratory tests.  The presence of NDMA was unexpected and is thought to be related to changes in the way the active substance was manufactured.***

> The FDA's review is ongoing and has included investigating the levels of NDMA in the recalled products, assessing the possible effect on patients who have been taking them and what measures can be taken to reduce or eliminate the impurity from future batches produced by the company.

> "The FDA is committed to maintaining our gold standard for safety and efficacy. That includes our efforts to ensure the quality of drugs and the safe manner in which they're manufactured," said FDA Commissioner Scott Gottlieb, M.D. "When we identify lapses in the quality of drugs and problems with their manufacturing that have the potential to create risks to patients, we're committed to taking swift action to alert the public and help facilitate the removal of the products from the market. As we seek the removal of certain drug products today, our drug shortages team is also working hard to ensure patients' therapeutic needs are met in the United States with an adequate supply of unaffected medications."

(Emphasis added.)

92.     On or about July 17, 2018, the FDA determined that health professionals should know that:

> The FDA has determined ***the recalled valsartan products pose an unnecessary risk to patients***.  Therefore, ***FDA recommends patients use valsartan-containing medicines made by other companies or consider other available treatment options***

*for the patient's medical condition*. If you have medication samples from these companies, *quarantine the products and do not provide them to patients*.

(Emphasis added.)

93.     On or about July 17, 2018, according to Janet Woodcock, M.D., director of the FDA's Center for Drug Evaluation and Research:

"We have carefully assessed the valsartan-containing medications sold in the United States, and we've found that the valsartan sold by these specific companies does not meet our safety standards.  This is why *we've asked these companies to take immediate action to protect patients*...."

(Emphasis added.)

94.     On August 21, 2018, Huahai posted information on its Internet website.  According to that post, a review of manufacturing and optimization processes in early June 2018 resulted in the discovery of NDMA, an impurity, in its Valsartan.  According to Huahai, NDMA is a carcinogen.

95.     Huahai has publicly stated that it isolated its storage of Valsartan API on hand, suspended its further release and manufacture, and notified the FDA and other regulatory agencies of its findings.

96.     Huahai also notified its customers and instructed them to suspend the further use of its Valsartan API.  Huahai then initiated a voluntary recall and provided periodic updates to both regulatory agencies and customers.

97.     According to Huahai, it undertook recalls at the consumer level to **protect human health.**  (Emphasis added.)

98.     On or about July 27, 2018, the FDA announced expanded recalls of additional Valsartan products manufactured by Defendants and non-parties, and re-packaged by third parties.[4]

99.     As stated in the FDA's July 13, 2018 statement:

The U.S. Food and Drug Administration is alerting health care professionals and patients of a voluntary recall of several drug products containing the active ingredient valsartan, used to treat high blood pressure and heart failure.  This recall

---

[4]  FDA News Release, FDA UPDATES ON VALSARTAN RECALLS, at https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-recepto r-blocker-arb-recalls-valsartan-losartan#5cd08c8221934 (last accessed May 15, 2019).

is due to an impurity, N-nitrosodimethylamine (NDMA), which was found in the recalled products. However, not all products containing Valsartan are being recalled. NDMA is classified as a probable human carcinogen (a substance that could cause cancer) based on results from laboratory tests. The presence of NDMA was unexpected and is thought to be related to changes in the way the active substance was manufactured.

**H.    DEFENDANTS' WARRANTIES AND FRAUDULENT AND DECEPTIVE STATEMENTS TO CONSUMERS REGARDING THEIR GENERIC VALSARTAN PRODUCTS**

100.    Each Defendant made and breached express and implied warranties and also made affirmative misrepresentations and omissions to consumers about their adulterated Valsartan products.

101.    NDMA is not an FDA-approved ingredient for branded Diovan or generic Valsartan. None of Defendants' Valsartan products (or any Valsartan product, for that matter) identifies NDMA as an ingredient on the products' labels or elsewhere.

102.    The FDA maintains a list of "Approved Drug Products with Therapeutic Equivalence Evaluations," commonly referred to as the Orange Book.[5]

103.    The Orange Book is a public document; Defendants sought and received the inclusion of their products in the Orange Book upon approval of their Valsartan ANDAs.

104.    In securing FDA approval to market generic Valsartan in the United States as an Orange Book-listed therapeutic equivalent to Diovan, Defendants were required to demonstrate that their generic Valsartan products were bioequivalent to brand Diovan.

105.    Therapeutic equivalence for purposes of generic substitution is a continuing obligation on the part of the manufacturer. For example, according to the FDA's Orange Book, therapeutic equivalence depends, in part, on the manufacturer's continued compliance with cGMPs.

106.    By introducing their Valsartan products into the United States market under the name "Valsartan" as a therapeutic equivalent to Diovan and with the FDA-approved label that is

---

[5]    FDA, APPROVED DRUG PRODUCTS WITH THERAPEUTIC EQUIVALENCE EVALUATIONS (ORANGE BOOK) SHORT DESCRIPTION, at https://www.fda.gov/drugs/resources-information-approved-drugs/approved-drug-products-therapeutic-equivalence-evaluations-orange-book (last accessed May 16, 2019).

the same as that of Diovan, Defendants represented and warranted to end users that their products are, in fact, the same as and are therapeutically interchangeable with Diovan.

107.   Furthermore, Defendant Solco states on its "About Solco" page of its website that "[b]y using the same active ingredients, [Solco] produces] products which are identical (equivalent) to the branded medication."[6]

108.   On the "Drug Safety" page of Solco's website, Solco states that "Solco Healthcare is committed in providing ... its patients with high quality, FDA-approved generic medications."[7]

109.   Defendant Solco lists its Valsartan products on its website with the statement that the "Reference Listed Drug" is "Diovan®" along with a link to download Solco's Valsartan Prescribing Information.[8]  Clicking the "Prescribing Information" link loads a .pdf of the Prescribing Information with a Solco URL address (http://www.solcohealthcare.com/uploads/product/info/valsartan-pi-artwork_170524_141555.pdf).

110.   Defendant Teva has a "Generics FAQs"[9] on its website.  In response to the question "Are generic drugs safe?" Defendant Teva states the following:

A generic drug is bioequivalent to the original innovative drug and meets the same quality standards.  The active ingredient, the content, the dosage form and the usage of a generic drug are similar to those of an innovative drug.  Generic drugs are essentially the same as the original drug, but are offered at a lower price.

111.   In response to the question "How do you ensure generic drug safety, having tried it in only a limited number of patients?" Defendant Teva states the following:

The generic product's active pharmaceutical ingredient (API) is identical to that of the innovative drug, its purity profile is similar and it is found to be bioequivalent; therefore its safety and efficacy are also comparable.

///

---

[6]  Solco, OVERVIEW, at http://solcohealthcare.com/about-solco.html (last accessed May 16, 2019).

[7]  Solco, TRADE PARTNER INFORMATION, at http://solcohealthcare.com/trade-partner-information.html#DrugSafety (last accessed May 16, 2019).

[8]  Solco, VALSARTAN TABLETS, at http://www.solcohealthcare.com/product/valsartan-tablets#NDC-43547-367-03 (last accessed May 16, 2019).

[9]  Teva, PRODUCTS, at https://www.tevapharm.com/our_products/generic_qa/ (last accessed May 16, 2019).

112.    Similarly, under the webpage titled "Uncompromising Quality," Teva states that it knows that its products affect patient health.  Teva further states that it "guarantee[s] the quality of our products" through Teva's "impeccable adherence to ... [cGMPs][.]"

113.    Each Defendant's Valsartan products were accompanied by an FDA-approved label.

114.    By presenting consumers with an FDA-approved Valsartan label, Defendants, as manufacturers, distributors, and sellers of Valsartan, made representations and express or implied warranties to consumers of the "sameness" of their products to Diovan, and that their products were consistent with the safety, quality, purity, identity, and strength characteristics reflected in the FDA-approved labels and/or were not adulterated.

115.    In addition, on information and belief, each Defendant affirmatively misrepresented and warranted to consumers through their websites, brochures, and other marketing or informational materials that their Valsartan product complied with cGMPs and did not contain (or were not likely to contain) any ingredients besides those identified on the products' FDA-approved labels.

116.    The presence of NDMA in Defendants' Valsartan: (1) renders Defendants' Valsartan products non-bioequivalent (i.e., not the same) to Diovan and, thus, non-therapeutically interchangeable with Diovan, thus breaching Defendants' express warranties of sameness; (2) was the result gross deviations from cGMPs, thus rendering Defendants' Valsartan products non-therapeutically equivalent to Diovan, breaching Defendants' warranties of sameness; and (3) results in Defendants' Valsartan containing an ingredient that is not also contained in Diovan, also breaching Defendants' warranty of sameness (and warranty that the products contained the ingredients listed on each Defendant's FDA-approved label).

117.    Each Defendant willfully, recklessly, and/or negligently failed to ensure their Valsartan products' labels and other advertising or marketing statements accurately conveyed information about their products.

118.    At all relevant times, Defendants have also impliedly warranted that their Valsartan products were merchantable and/or fit for their ordinary purposes.

///

119.     Due to its status as a probable human carcinogen as listed by both the IARC and the U.S. EPA, NDMA is not an FDA-approved ingredient in Valsartan.  The presence of NDMA in Defendants' Valsartan means that Defendants have violated implied warranties to Decedent, and Plaintiffs.  The presence of NDMA in Defendants' Valsartan results in Defendants' Valsartan products being non-merchantable and not fit for its ordinary purposes (i.e., as a therapeutically interchangeable generic version of Diovan), breaching Defendants' implied warranty of merchantability and/or fitness for ordinary purposes.

120.     For these and other reasons, Defendants' Valsartan is therefore adulterated.  See 21 U.S.C. §§ 351(a)(2)(B).

121.     Adulterated Valsartan is essentially worthless.  No consumer would purchase an adulterated Valsartan product or is even allowed to purchase an adulterated Valsartan product because it was illegally introduced into the United States.  This is especially so given that alternative, non-adulterated Valsartan products or competing medications with the same approved indications were available from other manufacturers.

**I.     DEFENDANTS WERE NEGLIGENT IN SUPPLYING, MANUFACTURING, MARKETING, DISTRIBUTING AND SELLING TO CONSUMERS THEIR GENERIC VALSARTAN PRODUCTS**

122.     At all times relevant herein Defendants intended to and did convey to Decedent that their prescription drug, Valsartan was of the quality necessary to be utilized for its intended purpose.

123.     At all times relevant herein, Defendants were negligent in supplying, manufacturing, marketing, distributing and/or selling the Adulterated Valsartan as a prescription drug safe for consumption by Decedent because Defendants failed to have adequate quality control procedures in place to determine that Valsartan API was adulterated.

124.     As a result of failing to maintain appropriate quality control procedures, Defendants failed to detect NDMA in the Adulterated Valsartan.

125.     Defendants made false and misleading representations and, prior to the Recall, failed to disclose to Decedent that the Adulterated Valsartan was contaminated with NDMA.

126.     The Adulterated Valsartan is worthless.

128.   Had Defendants disclosed to Decedent that the Adulterated Valsartan was contaminated with NDMA, Decedent would not have purchased the Adulterated Valsartan.

130.   Decedent, Walter T. Dilbeck, passed away on June 26, 2018, as a direct result of his consumption of the Adulterated Valsartan.

## J.   NEW REVELATIONS CONTINUE TO UNFOLD ABOUT OTHER MANUFACTURING PLANTS

131.   The recall of Defendants' Valsartan products is only the tip of the iceberg.  Just two weeks after the FDA's initial recall announcement, the FDA issued another announcement expanding the recall to other Valsartan products manufactured at another plant in India, and by other non-parties.  See supra n.4.  On August 30, 2018 the FDA announced that it was going to test all Valsartan products for NDMA.[10]  Because of Defendants' and non-parties' ongoing fraud and deception, the full scope of Defendants' and non-parties' unlawful conduct is not yet known.

## K.   FRAUDULENT CONCEALMENT AND TOLLING

132.   Plaintiffs' causes of action accrued on the date the FDA announced the recall of Defendants' generic Valsartan products.

133.   Alternatively, any statute of limitation or prescriptive period is equitably tolled on account of fraudulent concealment.  Defendants affirmatively concealed from Decedent and Plaintiff their unlawful conduct.  Defendants affirmatively strove to avoid disclosing their knowledge of ZHP's cGMP violations with respect to Valsartan, and of the fact that their Valsartan products were adulterated and contaminated with NMDA and were not the same as brand Diovan.

134.   For instance, no Defendant revealed to the public that their Valsartan product contained NDMA or was otherwise adulterated or non-therapeutically equivalent to Diovan until the FDA's recall announcement in July 2018.  The inspection report which preceded the recall announcement was heavily redacted (including the names of the drugs affected by ZHP's cGMP violations), and prior inspection reports or warnings were not fully available to the public, if at all.

///

---

[10]   FDA Statement, STATEMENT FROM FDA COMMISSIONER, at http://freepdfhosting.com/1c7e5ed26e.pdf (last accessed May 16, 2019).

198948

135.    To the contrary, each Defendant continued to represent and warrant that their generic Valsartan products were the same as and therapeutically interchangeable with Diovan.

136.    For instance, Huahai publicly announced on its website that, contrary to the FDA's pronouncements, that no impurity was discovered until June 2018.[11]

137.    Because of this, Decedent did not discover, nor could he discover through reasonable and ordinarily diligence, each Defendant's deceptive, fraudulent, and unlawful conduct alleged herein.  Defendants' false and misleading explanations, or obfuscations, lulled Decedent into believing that the prices paid for Valsartan were appropriate for what he believed to be non-adulterated drugs despite his exercise of reasonable and ordinary diligence.

138.    As a result of Defendants' respective affirmative and other acts of concealment, any applicable statute of limitations affecting the rights of  Plaintiff has been tolled.  Plaintiff exercised reasonable diligence by, among other things, promptly investigating and bringing the allegations contained herein.  Despite these or other efforts, Plaintiff was unable to discover, and could not have discovered, the unlawful conduct alleged herein at the time it occurred or at an earlier time so as to enable this Complaint to be filed sooner.

## L.    PLAINTIFFS' FACTUAL ALLEGATIONS

139.    Decedent Walter T. Dilbeck was a resident of Livermore, California.

140.    Plaintiff Ronald Dilbeck is a resident of Lincoln, California.

141.    On or about May 23, 2017, Decedent filled a 30-day prescription for Valsartan manufactured by the Solco Defendants and paid a co-pay.  Upon information and belief, Decedent filled additional Valsartan prescriptions manufactured by one or both of the Solco and Teva Defendants.

142.    The generic Valsartan purchased by Decedent manufactured by the Solco and/or Teva Defendants on May 23, 2017, and at other times was not therapeutically equivalent to brand Diovan, was manufactured out of compliance with cGMPs, and was adulterated by its contamination with NDMA.

---

[11]  Huahai, PRESS RELEASE -UPDATE ON VALSARTAN API - A STATEMENT FROM THE COMPANY, at https://www.huahaius.com/media.html (last accessed May 16, 2019

143.    The Solco Defendants and/or Teva Defendants' generic Valsartan was sold illegally to Decedent.

144.    On June 26, 2018, after one year of taking the drug Valsartan, Decedent passed away from neo-plasm of the liver caused by the adulterated Valsartan.

**FIRST CAUSE OF ACTION**

**Wrongful Death of Walter T. Dilbeck**

145.    Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

146.    The death of Decedent was directly and proximately caused by the negligent actions of Defendants in the negligent promotional and marketing activities associated with the sale of Valsartan, engaged in unfair and fraudulent business practices by advertising, marketing, and selling Valsartan products as therapeutically equivalent to and interchangeable with brand Diovan when that was not true, and introducing adulterated non-FDA approved Valsartan products into the U.S. market manufactured out of compliance with cGMPs and which are not therapeutically equivalent to brand Diovan.

147.    As a result of Decedent's death, Plaintiff Ronald Dilbeck, as the brother of the Decedent, has been deprived of Decedent's company, presence, advice, love, companionship, affection, solace, society, comfort, education, moral support, services, guidance, and support and other financial benefits for the past seventy  years and continuing into the future, and he has suffered direct pecuniary losses from these deprivations.

148.    Pursuant to California Code of Civil Procedure section 377.60 and all other applicable statutory and common law remedies, Plaintiff seeks recovery for the foregoing losses and damages for the value of such damages from the date of Decedent's wrongful death and continuing into the future to such time as Decedent could have reasonably been expected to live had he not passed away by consuming Defendants' adulterated Valsartan.

149.    Pursuant to California Code of Civil Procedure sections 377.60, and 3294(d) and all other applicable statutory and common law remedies, Plaintiff further seeks recovery of punitive ///

damages arising from Decedent's wrongful death  by consuming  Defendants'

adulterated Valsartan.

150.    Plaintiff has also incurred funeral and burial expenses as a result of Defendants'

actions for which Plaintiff seeks recompense from Defendants.

## SECOND CAUSE OF ACTION

### Survivor Cause of Action

151.    Plaintiffs re-allege and incorporate by reference the allegations contained in all

preceding paragraphs of this Complaint as though set forth fully herein.

152.    Plaintiff Ronald Dilbeck, as the brother of the Decedent, is the Successor in Interest

to Decedent for purposes of bringing an action under CCP Section 377.30, et seq., and has

complied with CCP Section 377.32.

153.    At all times prior to this incident, Defendants, and each of them, negligently,

carelessly, recklessly, and/or unlawfully acted and/or failed to act, including but not limited to

failing to perform mandatory duties so as to cause the death of Decedent.

154.    As a direct and legal result of the wrongful acts and/or omissions of Defendants,

and each of them, on June 26, 2018, and immediately prior to Decedent's death, expenses were

incurred for emergency and medical services.

155.    As a further direct and legal result of the wrongful acts and/or omissions of

Defendants, and each of them, Decedent also endured great pain and suffering from the liver

cancer he lived with as a result of the adulterated Valsartan manufactured by Defendants.

## THIRD CAUSE OF ACTION

### Violation of California Consumer Legal Remedies Act

### Cal. Civ. Code §§ 1750, et Seq.

156.    Plaintiffs re-allege and incorporate by reference the allegations contained in all

preceding paragraphs of this Complaint as though set forth fully herein.

157.    Plaintiffs have standing to pursue this claim as Plaintiffs suffered injury in fact and

lost money or property as a result of Defendants' actions.

///

158.    At all times relevant hereto, Defendants were and are "persons" as defined in Cal. Civ. Code § 1761(c).

159.    At all times relevant hereto, Decedent  was a "consumer" as defined in Cal. Civ. Code § 1761(d).

160.    At all times relevant hereto, Defendants' Valsartan products constituted "goods" as defined in Cal. Civ. Code § 1761(a).

161.    At all times relevant hereto, Defendants' sales of their Valsartan products to Decedent constituted "transactions" as defined in Civil Code § 1761(e).

162.    The following subsections of Cal. Civ. Code § 1770(a) prohibit the following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction which is intended to result or which results in the sale or lease of goods or services to any consumer:

> (2) Misrepresenting the source, sponsorship, approval, or certification of goods or services;
> (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have;
> (7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;
> (9) Advertising goods or  services with the intent not to sell them as advertised;
> (16) Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

163.    Defendants have violated and continue to violate the above-enumerated provisions of Cal. Civ. Code. § 1770(a) by representing that their generic Valsartan products are the same as brand Diovan; and that their generic Valsartan products were distributed "as approved" by the FDA.  Defendants distributed their generic Valsartan products with the intent not to sell as advertised (i.e., the same as brand Diovan).

164.    Defendants have violated and continue to violate the above-enumerated provisions of Cal. Civ. Code. § 1770(a) by making fraudulent omissions that were contrary to representations actually made by Defendants; and, fraudulently omitting material facts Defendants were obliged to disclose.

165.    To the extent necessary, Decedent relied on such omissions.

166.    Plaintiffs will file the declaration of venue required by Cal. Civ. C. § 1780(d).

167.    Pursuant to Cal. Civ. Code § 1780(a), Plaintiffs currently seek restitution and an order enjoining Defendants from engaging in the methods, acts, and practices alleged herein, and any other relief deemed proper by the Court.

168.    Either before or concurrent with filing the Complaint, Plaintiffs have sent or are sending Defendants notice advising Defendants of their violations of Section 1770 of the CLRA (the "Notice").  The Notice complied in all respects with Section 1782 of the CLRA.  Plaintiffs sent the Notice by Certified U.S. Mail, return-receipt requested to Defendants at Defendants' principal places of business.  Plaintiffs' Notice advised Defendants they must correct, repair, replace or otherwise rectify its conduct alleged to be in violation of Section 1770.  If Defendants fail to correct, repair, replace or otherwise rectify the conduct alleged herein, Plaintiffs will amend this Complaint to seek damages.

169.    Pursuant to Cal. Civ. Code § 1780(e), Plaintiffs seek an award of restitution, costs and attorneys' fees.

## FOURTH CAUSE OF ACTION

### Common Law Fraud, Including Fraudulent Inducement, and

### Fraudulent Concealment

170.    Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

171.    Defendants made or caused to be made false and fraudulent representations of material facts, and failed to disclose material facts to Decedent regarding Defendants' Valsartan products.

172.    Defendants affirmatively misrepresented material facts including, inter alia, that their Valsartan products were therapeutically equivalent to brand Diovan and/or complied with cGMPs and/or were not adulterated.

173.    Defendants failed to disclose material facts to render non-misleading its statements about, inter alia, that their Valsartan products were not therapeutically equivalent to brand Diovan and/or did not comply with cGMPs and/or were adulterated.

174.    Defendants' actions had the effect of fraudulently inducing customers to pay in whole or in part for Defendants' Valsartan product - product which Defendants knew or should have known was not therapeutically equivalent to brand Diovan and/or did not comply with cGMPs and/or were adulterated.  Decedent would not have paid some or all of the amounts he paid for Defendants' Valsartan product had he known the truth.

175.    Defendants knew, or reasonably should have known, that their misrepresentations were materially false or misleading, or that the omission of material facts rendered such representations false or misleading.

176.    Defendants also knew, or had reason to know, that their misrepresentations and omissions would induce Decedent to pay for some or all of the cost of Defendants' Valsartan products.

177.    Defendants' misrepresentations and omissions were material.

178.    To the extent applicable, Defendants intended their misrepresentations and omissions to induce Decedent to pay for Defendants' Valsartan product.

179.    But for the misrepresentations and omissions, Decedent would not have paid for Defendant's Valsartan product.

180.    To the extent applicable, Decedent was justified in relying on Defendants' misrepresentations and omissions.  The same or substantively identical misrepresentations and omissions were communicated through product labeling and other statements by Defendants.  No reasonable consumer would have paid what they did far Defendants' Valsartan product but-for Defendants' unlawful conduct.  To the extent applicable, reliance may be presumed in these circumstances.

181.    Plaintiffs were damaged by reason of Defendants' misrepresentations and omissions alleged herein.

///

///

///

///

**FIFTH CAUSE OF ACTION**

**Violation of Cal. Civ. Code §§ 1709, 1710**

**(Deceit by Concealment)**

182.    Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

183.    Defendants engaged in deceit by suppressing facts that each was bound to disclose. Namely, Defendants sold their generic Valsartan products to Decedent and did not disclose the fact that their generic Valsartan products were not the same as brand Diovan, and were in fact adulterated with NDMA and manufactured not in compliance with cGMPs.

184.    Defendants' deceitful conduct was perpetrated with the intent to induce Decedent, to act in reliance thereon.

185.    Decedent reasonably believed Defendants' representations that their Valsartan products were therapeutically equivalent and interchangeable with brand Diovan.

186.    Decedent would not have purchased Defendants' Valsartan products if the deceit had been disclosed.

187.    As a direct and proximate result of the foregoing acts, omissions, Plaintiffs have suffered injury in fact and are entitled to restitution in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION**

**Violation of Song-Beverly Consumer Warranty Act for Breach of Implied Warranty of**

**Merchantability, Cal. Civ. Code §§ 1792 & 1791.1(a)**

188.    Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

189.    Decedent was a "retail buyer" within the meaning of § 1791(b) of the California Civil Code.

190.    Defendants' Valsartan products are "consumer goods" within the meaning of § 1791(a) of the California Civil Code.

191.    Each Defendant is a "distributor", "manufacturer", and/or "retailer" of generic Valsartan products within the meaning of § 1791(e), (j), and (1) of the California Civil Code.

192.     Defendants impliedly warranted to Decedent, and Plaintiff that their Valsartan products were "merchantable" within the meaning of §§ 1791.1(a) and 1792 of the California Civil Code.

193.     Defendants breached the implied warranty of merchantability to Decedent because Defendants' Valsartan products were not manufactured in accordance with Defendants' approved ANDA, and were not the same as brand Diovan, and because Defendants' Valsartan products were adulterated with NDMA and manufactured not in compliance with cGMPs.  All of these failures resulted in Defendants' Valsartan products being illegally distributed in the United States, rendering them non-merchantable.

194.     Defendants' failure to warn Decedent of these risks was willful.

195.     As a proximate result of Defendants' breach of the implied warranty of merchantability, Decedent sustained death from the goods he would not have otherwise purchased and which are not fit for the ordinary purpose for which they are used.

196.     Pursuant to § § 1791.1(d) and 1794 of the California Civil Code, Plaintiffs seek and are entitled to restitution, civil penalties and other legal and equitable relief including, a right of reimbursement, as well as costs, expenses and attorneys' fees.

**SEVENTH CAUSE OF ACTION**

**Violation of Song-Beverly Consumer Warranty Act for Breach of Implied**

**Warranty of Fitness, Cal. Civ. Code §§ 1792.1 & 1791.1(b)**

197.     Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

198.     Decedent was a "retail buyer" within the meaning of §1791(b) of the California Civil Code.

199.     Defendants' Valsartan products are "consumer goods" within the meaning of § 1791(a) of the California Civil Code.

200.     Each Defendant is a "distributor", "manufacturer", and/or "retailer" of Valsartan products within the meaning of § 1791(e), (j), and (l) of the California Civil Code.

///

201.    Defendants breached the implied warranty of merchantability to Decedent because Defendants' Valsartan products were not manufactured in accordance with Defendants' approved ANDA, and were not the same as brand Diovan, and because Defendants' Valsartan products were adulterated with NDMA and manufactured not in compliance with cGMPs.  All of these failures resulted in Defendants' Valsartan products being illegally distributed in the United States, rendering them non-merchantable.

202.    Decedent did in fact purchase Defendants' Valsartan products for the particular purpose of consuming a generic version of the brand drug Diovan as approved by the FDA's ANDA process.

203.    Decedent did in fact reasonably rely on Defendants' skill or judgment to supply suitable pharmaceutical products for that purpose.

204.    Defendants breached their implied warranty of fitness for a particular purpose and are liable to Plaintiffs.

205.    Defendants' failure to warn Decedent was willful.

206.    As a proximate result of Defendants' breach of the implied warranty of fitness, Plaintiffs sustained damages including but not limited to the receipt of goods they would not have otherwise purchased and which are not fit for the ordinary purpose for which they are used.

**EIGHTH CAUSE OF ACTION**

**Breach of Implied Warranty of Merchantability**

207.    Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein..

208.    Defendants are merchants within the meaning of Cal. Comm. Code § 2314.

209.    Each Defendant's Valsartan product constituted "goods" or the equivalent within the meaning of the above statute and related provisions.

210.    Each Defendant was obligated to provide Decedent reasonably fit Valsartan product for the purpose for which the product was sold, and to conform to the standards of the trade in which Defendants are involved such that the product was of fit and merchantable quality.

///

211.    Each Defendant knew or should have known that its Valsartan product was being manufactured and sold for the intended purpose of human consumption as a therapeutic equivalent to brand Diovan, and impliedly warranted that same was of merchantable quality and fit for that purpose.

212.    Each Defendant breached its implied warranty because each Defendant's Valsartan product was not of merchantable quality, nor fit for the product's ordinary purpose, and did not conform to the standards generally applicable to such goods.

213.    As a direct and proximate result of each Defendant's breach of implied warranty, Plaintiffs have been injured and suffered damages, in that Defendants' Valsartan product they purchased was so inherently flawed, unfit, or unmerchantable as to have essentially zero, significantly diminished, or no intrinsic market value.

214.    Plaintiffs are concurrently giving notice of Defendants' breach.  Plaintiffs will amend this complaint to seek damages in an amount to be determined at trial.

### NINTH CAUSE OF ACTION

### Breach of Express Warranties

215.    Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

216.    Each Defendant expressly warranted that its Valsartan product was fit for its ordinary use, i.e., as an FDA-approved generic pharmaceutical that is therapeutically to and interchangeable with brand Diovan.  In other words, Defendants expressly warranted that their products were the same as Diovan.

217.    Each Defendant sold Valsartan product that they expressly warranted were compliant with cGMP and/or not adulterated.

218.    Each Defendant's Valsartan product did not conform to each Defendant's express representations and warranties because the product was not manufactured in compliance with cGMP and/or was adulterated.

219.    Each Defendant made express warranties regarding its Valsartan products as set forth in Cal. Comm. Code § 2313.

220. At the time that each Defendant marketed and sold its Valsartan product, they recognized the purposes for which the products would be used, and expressly warranted the products were the same as brand Diovan, and cGMP compliant and/or not adulterated. These affirmative representations became part of the basis of the bargain in every purchase by Decedent.

221. Each Defendant breached its express warranties with respect to its Valsartan product as it was not of merchantable quality, was not fit for its ordinary purpose, and did not comply with cGMP and/or was adulterated.

222. As a direct and proximate result of each Defendant's breach of implied warranty, Plaintiffs have been injured and suffered damages, in that Defendants' Valsartan product they purchased was so inherently flawed, unfit, or unmerchantable as to have essentially zero, significantly diminished, or no intrinsic market value.

223. Plaintiffs are concurrently giving notice of Defendant's breach. If the violations are not remedied or cured, Plaintiffs will amend this complaint to seek damages in an amount to be determined at trial.

**TENTH CAUSE OF ACTION**

**Violation of California Unfair Competition Law**

**Cal. Bus. &Prof. Code § 17200, et Seq. ("Unfair" and "Fraudulent" Prongs)**

224. Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

225. California Business & Professions Code section 17200 prohibits "unfair competition" which includes "unfair" and "fraudulent" business practices.

226. Defendants engaged in unfair and fraudulent business practices by advertising, marketing, and selling Valsartan products as therapeutically equivalent to and interchangeable with brand Diovan when that was not true.

227. Defendants engaged in unfair and fraudulent business practices by advertising, marketing, and selling Valsartan products representing that their Valsartan was manufactured in accordance with their respective ANDA approvals and in compliance with FDA's cGMPs.

///

However, this was factually untrue because Defendants' Valsartan products were contaminated with NDMA and were not manufactured in accordance with cGMPs.

228.    Defendants' business practices, as alleged herein, are unfair because: (1) the injury to the consumer is substantial-they were charged significant sums for products that are contaminated with a probable human carcinogen that was illegally distributed to them and which they cannot use for their intended purpose; (2) the injury is not outweighed by any countervailing benefits to consumers or competition, as there can be no benefit to consumers where they pay for a product that is illegally manufactured and distributed to them and which is contaminated with a probable human carcinogen; and (3) consumers could not reasonably have avoided the injury.

229.    Defendants' business practices are also unfair because their materially false and misleading advertising, marketing, promotion, and sale of their Valsartan products (namely, representing they were the same as brand Diovan and therapeutically interchangeable with brand Diovan) offends an established public policy and is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.  Such public policy is tethered to a specific constitutional, statutory provision, including California's consumer protection statutes, as alleged herein.

230.    Defendants' business practices as alleged herein are fraudulent because Defendants make and have made material misrepresentations and omissions in the marketing, promotion, and sale of their Valsartan products.  These misrepresentations and omissions by Defendants were material, in that a reasonable consumer would attach importance to whether Defendants' generic Valsartan products were therapeutically interchangeable with brand Diovan and/or were free of adulteration with carcinogenic substances.

231.    Defendants' conduct is likely to deceive reasonable consumers.  Indeed, reasonable consumers would believe that the marketing, promotion, and sale of prescription drugs called "Valsartan" carries an express assurance that Defendants' products are in fact manufactured as approved by the FDA and are free of contamination and/or are therapeutically interchangeable with brand Diovan.

232.    Decedent relied on Defendants' misrepresentations and omissions of material facts.  Had Defendants disclosed that their products were not manufactured in accordance with the FDA

approved label and/or were contaminated with NDMA and/or were not therapeutically equivalent to brand Diovan, Decedent would not and could not have paid for the products.

233.    Defendants' acts and practices were false, misleading, deceptive, and unfair to consumers, in violation of the California Unfair Competition Law.

234.    As a direct and proximate result of Defendants' deceptive, fraudulent, and unfair practices, Plaintiffs lost money and suffered injury in fact in an amount to be determined at trial.

235.    Plaintiff RONALD DILBECK, on behalf of himself individually and on behalf of THE ESTATE OF WALTER T. DILBECK demand judgment against the Defendants for restitution and injunctive relief.

## ELEVENTH CAUSE OF ACTION

### Violation of California Unfair Competition Law

### Cal. Bus. &Prof. Code § 17200, et Seq. ("Unlawful" Prong)

236.    Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

237.    The actions of Defendant, as alleged herein, constitute illegal and unlawful practices committed in violation of Cal. Bus. &Prof. Code § 17200, et seq.

238.    Defendants have engaged in a scheme of introducing adulterated non-FDA approved Valsartan products into the U.S. market manufactured out of compliance with cGMPs and which are not therapeutically equivalent to brand Diovan.  In undertaking these actions, Defendants are violating the law, including the common law and violations of: (1) Cal. Civ. Code §§ 1770(a)(2), 1770(a)(5), and 1770(a)(9); (2) Cal. Civ. Code § 1709 & 1710; (3) Cal. Civ. Code §§ 1791 & 17922; and Cal. Bus. &Prof. Code § 17200 et seq.

239.    Pursuant to Cal. Bus. &Prof. Code § 17203, Plaintiff  seeks an order of this Court enjoining Defendants from engaging in the unfair competition alleged herein in connection with advertising, marketing, promoting, and selling products based upon misrepresentations and omissions of material facts, as alleged in greater detail above.

240.    Additionally, Plaintiffs request an order awarding Plaintiffs  restitution of the money wrongfully acquired by Defendants by means of the unfair competition alleged herein.

241.   As a direct and proximate result of Defendants' deceptive, fraudulent, and unfair practices, Plaintiffs have lost money and suffered injury in fact in an amount to be determined at trial.

242.   Plaintiff, RONALD DILBECK, on behalf of himself and the ESTATE OF WALTER T. DILBECK demand judgment against the Defendants for restitution and injunctive relief.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and on behalf of the ESTATE OF WALTER T. DILBECK, pray for relief and judgment on all Causes of Action of the Complaint and request the following:

1.   For restitution on behalf of Plaintiff;

2.   For monetary damages;

3.   Imposition of a constructive trust upon all monies and assets Defendants have acquired as a result of unfair practices;

4.   For all appropriate declarative and injunctive relief, enjoining Defendants from pursuing and/or continuing the unlawful conduct complained in herein;

5.   For an order declaring and/or a judicial determination of the respective rights and duties of Plaintiffs  with respect to whether Defendants violated Cal Civ. Code §§ 1750, et seq., Cal. Civ. Code §§ 1709, 1710, Cal. Civ. Code §§ 1791, 1792, Cal. Bus. &Prof. C. §§ 17200, et seq., and the common law;

6.   For attorneys' fees and reimbursement of all costs for the prosecution of this action;

7.   For pre-judgment and post-judgment interest; and,

8.   For such other and further relief this Court deems just and appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs respectfully demand a trial by jury on all issues within the instant action so triable.

///

///

1

2

DATED: June 12, 2019                    HANSEN, KOHLS, SOMMER & JACOB, LLP

3                                  By:   /s/ *DANIEL V. KOHLS*
                                         DANIEL V. KOHLS
4                                        DANIEL W. ROBERTSON
                                         Attorneys for Plaintiff
5                                        RONALD DILBECK, individually
                                         and on behalf of THE ESTATE OF WALTER
6                                        T. DILBECK

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

198948